WM. CAMERON & CO., Inc., v. CUFFIE et al.

(Court of Civil Appeals of Texas. Galveston. Jan. 25, 1912. Rehearing Denied Feb. 22, 1912.)

1. ADVERSE POSSESSION (§ 85*) — HOSTILE POSSESSION—EVIDENCE.

In trespass to try title, evidence *held* to show the hostile possession of defendants and their grantors for more than 10 years.

[Ed. Note.—For other cases, see Adverse Possession, Dec. Dig. § 85.*]

2. ADVERSE POSSESSION (§ 100*) — HOSTILE POSSESSION—CONSTRUCTIVE POSSESSION.

Where one who held an entire tract of land under color of title actually used and cultivated part of the tract for the statutory period, his adverse title to the whole is established, such possession being an encroachment sufficient to give notice to the owner.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 547–574; Dec. Dig. § 100.*]

3. COURTS (§ 200¼*)—STATE COURTS—TEXAS —PROBATE COURT—JURISDICTION.

The probate court had in 1839 no jurisdiction to decree specific performance of a contract to convey land.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 200¼.*]

4. TRESPASS TO TRY TITLE (§ 39*)—EVIDENCE —ADMISSIBILITY.

In trespass to try title, the admission both of an administrator's deed and a decree of the probate court made in 1839, and directing the administrator to convey land of the decedent under a contract made by him before his death, was not erroneous, though the probate court had no jurisdiction to award specific performance, where a consent decree later entered in the district court and joined in by all the heirs of the decedent provided that all the deeds of the administrator should be valid.

[Ed. Note.—For other cases, see Trespass to Try Title, Dec. Dig. § 39.*]

5. JUDGMENT (§ 712*)—EFFECT—PARTIES.

Where plaintiff in trespass to try title deraigned his title from conveyance made in obedience to a decree, defendants could not object that they were not parties to the decree, its only purpose being to show that plaintiff took a prior valid title.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1233; Dec. Dig. § 712.*]

6. APPEAL AND ERROR (§ 719*)—ASSIGNMENTS OF ERROR.

Objections not embraced in the assignments of error will not be considered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2968–2982; Dec. Dig. § 719;* Costs, Cent. Dig. § 814.]

7. ACKNOWLEDGMENT (§ 25*) — CONVEYANCES —MARRIED WOMEN'S ACT.

Prior to act of Feb. 3, 1841 (Laws 1840–41, p. 144), a privy acknowledgment of a deed by a married woman was not necessary to its validity.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 133–148; Dec. Dig. § 25.*]

8. HUSBAND AND WIFE (§ 184*) — CONVEYANCE BY WIFE—VALIDITY—PRESUMPTIONS.

After a lapse of more than 50 years and in the absence of any claim to the contrary, it will be presumed that a conveyance by a married woman was with the consent of her husband.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 716–718; Dec. Dig. § 184.*]

Appeal from District Court, Polk County; L. B. Hightower, Judge.

Consolidated actions by Wm. Cameron & Company, Incorporated, against Frank Cuffie and J. W. Cobb. From a judgment for both defendants, plaintiff appeals. Affirmed.

Sleeper, Boynton & Kendall and J. A. Platt, for appellant. J. C. Feagin and S. H. German, for appellees.

REESE, J. On January 8, 1908, plaintiff, Wm. Cameron & Co., Incorporated, filed two suits in trespass to try title in the district court of Polk county, one against Frank Cuffie seeking recovery of a tract of land in the Rafael Bicera league containing 162 acres; the other against J. W. Cobb seeking a recovery from him of a tract of land in the same grant containing about 350 acres. The pleading in each case was in the ordinary form of trespass to try title.

Frank Cuffie answered by general demurrer, general denial, plea of not guilty, and disclaimed as to all of the land sued for except 160 acres of land out of the R. Bicera league set out and described in his said answer, as to which he pleaded the statute of limitation of 3, 5, and 10 years.

The defendant J. W. Cobb answered by general demurrer, general denial, plea of not guilty, and disclaimed as to all of the land sued for by plaintiff except 280 acres, more or less, described by metes and bounds in his answer as being part of the said Rafael Bicera league, and as to said tract he pleaded the statute of limitation of 3, 5, and 10 years. The lands described in the respective answers of Cuffie and Cobb were substantially the same lands set out and described respectively in the petitions filed by plaintiff in the suits against them, mentioned above.

By agreement of the parties, these causes were set down to be tried together as the issues in each case were almost identical, and, upon suggestion of the parties, the court made an order consolidating the two cases and the same were tried together as one cause. The cause was tried by the court without a jury, who, after hearing the evidence, gave judgment against the plaintiff and in favor of both defendants. No conclusions of law and fact were requested and

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

none filed by the court. From the judgment plaintiff, Wm. Cameron & Co., Inc., appeals.

The evidence authorizes the following conclusions of fact: The Bicera league is located in Polk county, but in territory formerly belonging to Trinity county. The land in controversy is part of this league. Appellant shows title to the 160 acres known as the Wagnon survey, and right to recover the same, except in so far as such right and title is defeated by the statutes of limitation pleaded by Frank Cuffie and others, who claimed this tract. Appellant also showed title to, and right to recover, the 280 acres claimed by Cobb, except that portion thereof in conflict with a certain 160 acres which had been conveyed by J. L. Hodge to Martin, and by Martin to A. Jernigan, as to which it concedes that it had no title. The decision of this appeal does not require any further reference to the portion of the land as to which this concession is made. The following plat was introduced in evidence and serves to illustrate and explain the testimony as to possession of appellees, and those under whom they claim.

In August, 1856, the county surveyor of Trinity county made three surveys on the Bicera league, then claimed to be vacant. A pre-emption survey of 160 acres for T. P. Wagnon, a pre-emption survey of 160 acres for A. Jernigan, and a 320-acre survey for A. Jernigan under a land certificate issued to one Kuykendall. These several surveys and their location as to each other are shown on the map. The A. Jernigan 160-acre pre-emption is not involved in this suit, nor is the 40 acres off the north side of the A. Jernigan 320 acres, and adjoining the A. Jernigan 160 acres. The land in dispute is the Wagnon pre-emption and all of the Jernigan or Kuykendall 320 acres, except the 40-acre strip referred to, and also excepting that portion of this survey as to which appellant concedes that it has no title—and a parcel of land inclosed and claimed by Cobb as part of his 280 acres, lying south of the Wagnon, as shown by the plat.

T. P. Wagnon sold and conveyed to A. Jernigan his 160 acres by deed dated June 22, 1863, and recorded June 29, 1863. A. Jernigan by deed dated September 2, 1865,

EXHIBIT A

N

A. JERNIGAN 160 A

432

280 E. JERNIGAN 356

40 ACRES

J.P. WAGNON 160 A.

1362

340 PINEY

A. BURNEY 160 A.

2525

655

890

300

760

630

570

KUYKENDALL 320 A

1220 CREEK

J. W. COBB

A JERNIGAN 160 A.

750

950

1010

1620

200

250

SALT CREEK

1405

A PART OF R. BICERA HEADRIGHT LEAGUE.

S. E. CORNER

144 S.W.—65

and recorded October 11, 1865, conveyed to W. A. Jernigan 640 acres, including the Wagnon, the Jernigan 160-acre pre-emption, and the 320 acres located under the Kuykendall certificate. By deed dated June 19, 1867, and recorded September 22, 1884, W. A. Jernigan conveyed to A. Jernigan 200 acres of land "to be taken out of said 640 acres so that it will include the dwelling house where A. Jernigan now lives, and also the cultivated land lying south and southeast of said house, and also to be as nearly in a square form as may be and to run with the boundary line as possible." In 1884, at the instance of the Jernigans, the county surveyor of Trinity county made a survey of 40 acres off the north side of the 320 acres, which taken with the 160 acres, the A. Jernigan pre-emption, made 200 acres.

The evidence shows that A. Jernigan, at the date of the deed to him of the 200 acres, lived in the northwest corner of the 160-acre tract, and that there were cultivated fields south and southeast of his house on this 160 acres. One of these fields was in the southeast corner of the 160 acres, and the other was on the west side, and in the southwest corner of this tract, and the inclosure also extended over and included land on the Wagnon and the 320 acres. The 200 acres so sold and conveyed included all of the A. Jernigan 160 acres, and the 40-acre strip off the north side of the 320 acres run off by the surveyor in 1884.

By deed dated January 26, 1877, A. Jernigan conveyed this 200 acres by the same description to his wife, Elizabeth Jernigan. This land is not involved in this suit, but the above findings are perhaps necessary to explain some of the contentions as to the effect of the possession of A. Jernigan of this 200 acres.

By deed dated January 25, 1902, and filed for record April 22, 1904, W. A. Jernigan conveyed to Frank Cuffie the 160 acres included in the Wagnon survey. This constitutes the paper title of Frank Cuffie to the Wagnon survey.

By deed dated November 13, 1897, and recorded June 5, 1907, W. A. Jernigan conveyed to Thornton & Stegner a tract of land, describing it by metes and bounds, which included the balance of the 320 acres after cutting off the 40 acres, and extends west to the A. Burney survey, and takes in a small tract lying south of the Wagnon, as shown by the plat.

[1] We find that the evidence authorizes the conclusion that the parties, respectively, that is, Frank Cuffie and J. W. Cobb, and those under whom they deraign title, have been in continuous, actual, peaceable, and adverse possession of the land claimed by them, cultivating, using, and enjoying the same, and claiming to be the owners thereof for more than 10 years next before the institution of this suit. As appellant in its assignments of error presents only the question of the sufficiency of the evidence to support this finding, it will be necessary in passing upon such assignments to refer to such of the evidence as supports the conclusions of the trial court on this point, and it is not necessary to be more specific in such finding now than to make the general finding above.

By the first assignment of error, appellant complains that the evidence is insufficient to show such possession in Frank Cuffie, and those under whom he claims, of the Wagnon survey as is necessary to support his title under the statute of limitations of either 5 or 10 years.

As to this tract, the evidence showed conclusively that it was surveyed for T. P. Wagnon as a pre-emption in 1856, the land being supposed to be vacant, and that he went into possession at that time. He had a house in which he lived on the place, and a cultivated farm of 30 or 40 acres, besides an inclosed pasture which seems to have taken in about all the tract.

Ty Cuffie testified: "That he was 73 years old; came to Texas before the Civil War; was a slave and belonged to old man Jernigan and helped clear the land, which was begun when they first moved to the place before the war. Cleared all the land around there except the Wagnon place. The Wagnon place was settled before the Jernigan place. The land down there below the walnut tree next to the creek on the Jernigan land had been cultivated nearly all the time. Doesn't think that place was laid out any one year until a year or so ago. Went along with Mr. Pennington when he cut off the 40 acres. Knows the field there south of the Burney (Jernigan) house down next to the creek. It was among the first he cleared, and it was cultivated every year up until a year or two ago. The Wagnons were living on the Wagnon place when he came to Texas. Wagnon sold the place to old man Jernigan, and it had been cultivated by him and Mage except one or two years since, besides the cultivation he (Jernigan) did on it. It had been cultivated every year since Jernigan bought from Wagnon. That is, not all of it has been in cultivation every year. Some part of it except a year or so back. There was a house on it when Jernigan bought. It stayed there a good long time and was burned. There was a good big field on the Wagnon place. Wagnon owned five or six slaves. Stayed with Jernigan after the war on the place two years and worked the land. The Jernigan boys built a house on the Wagnon place, built a house after the other one burned down, but don't know how long afterwards. Frank Cuffie was on witness' place; been farming the land. Don't know how long he had been farming there. Bought it five or six years ago. Has been farming it ever since. There was a farm on the west part of it besides the one Frank Cuffie cleared,

and witness and Mage cultivated that. Frank cultivated a part of it. The main part was cleared by Mr. Jernigan."

On cross-examination witness testified that "the first land put in cultivation by witness (for Jernigan) was south of the house. The house was in the L shape part of the Jernigan survey just north of the Wagnon. The first land Jernigan put in was in the spring of 1856. It was in the southwest corner of the Jernigan tract from the Wagnon tract. One fence divided the two men. They joined fences. The walnut tree is about on the line between the Wagnon and Jernigan tract. Jernigan put in some land west of the walnut tree and continued to a branch or drain which runs west of the walnut tree about 150 or 200 yards. We cleared to the drain. The fence that divided the Wagnon field and the Jernigan field ran down the drain. Wagnon's field was west of the drain and right south of the Wagnon house. After Jernigan bought out Wagnon, Mage tended the land one or two years and I tended it one year. I did not live in the Wagnon house, but Mage did two years. The land Mage tended was the old Wagnon field west of that branch. I reckon there was as much as 30 acres in cultivation on the Wagnon tract, west of the drain. That was the only field on the Wagnon tract. Nobody lived in the house after Mage moved out. Don't know who tended the land, that old Wagnon field, after I quit, but I think them boys tended it as near as I can recollect. They did not move the fence away, not right then. The fence ran down that hollow and back down toward the pasture. They were using the old Wagnon field there a long time, can't tell you the length of time it was tended. Mage tended it, and I tended it, and them Jernigan boys tended it. I tended it about two years, and the old man gave me what I made on it. The Jernigan boys I spoke of was Zeke and the others. So far as witness knew, nobody ever tended that Wagnon field except Mage, himself, and the Jernigan boys. That is, the children of the second marriage of Mr. Jernigan. The field in the southwest corner (of the Jernigan 160 acres) was put in 1856; cleared the farm in the southeast corner of the Jernigan tract, where Zeke's house is, soon after they moved there, besides the big field next to the Wagnon tract; the small field near Zeke's house in the southeast corner; 10 or 12 acres, that was put in before the war. It has not been tended regularly. The fields in the southeast and southeast corners were put in about the same time. Zeke built the house down there in the southeast corner three or four years ago."

On redirect examination the witness testified: "Mr. Jernigan cleared two fields when I first moved there. The one in the southwest corner, next to the Wagnon tract, and the one in the southeast corner. The field in the southwest corner extended 200 or 300 yards east from the walnut tree and 200 or 300 yards south. That field never laid out until a few years ago. It was cleared in 1856. The pasture fence on the Wagnon place, built by Mr. Jernigan, extended from the house place to the graveyard. It took all of the Wagnon place in. The pasture fence stayed there until it rotted down. The fence ran from the Jernigan house to the bottom and came around to the walnut tree. With reference to who cultivated the Wagnon place during the old gentleman's lifetime after he bought it, first one and then another cultivated the land every year up to a few years ago, and some of it has been cultivated every year. Very nearly every year—that is, a part of it—Mage cultivated it two years, I cultivated it a year or two, and then the boys. First one and then another among the boys cultivated it. Yes, sir; I found a pasture down there, and that pasture runs from the house clear around the Wagnon tract where Mr. Jernigan lives, and then it came down there to the southeast corner of the Wagnon tract where the farm was and took that in. That pasture was partly on the Jernigan tract and partly on the Wagnon tract. It run down from the house and got his woodland place between the Wagnon field on down and great part of the field and went on around. It had a good many acres in it then when we took that woodland in; I reckon there was more than 25 or 30 acres in it. There was more woodland part on the Jernigan part than on the Wagnon part."

This testimony was substantially corroborated by Frank Cuffie, Zeke Jernigan and W. A. Jernigan, the last witness being the same person to whom A. Jernigan conveyed the entire 640 acres in 1865, and who conveyed the 200 acres to A. Jernigan in 1867. He also testified, in substance, that such of the land as was used and cultivated after his conveyance up to the time he conveyed to Frank Cuffie in 1902 was held, used, and occupied under him, the persons so cultivating and using being his tenants, and that he only required that they keep up the improvements.

We think this testimony was amply sufficient to support the judgment. It shows, in fact, substantially continuous use and occupancy of the Wagnon from 1856 up to the trial, such possession being held under registered deeds; and the evidence further shows payment of taxes by the respective owners during most of that time. There were at all times cultivated fields on the Wagnon and during nearly all the time a house used as a home by the owners, all amply sufficient to give notice to the adverse claimant of the hostile claim of appellees and those under whom they claimed. As the testimony was sufficient to show that, after the conveyance of the 200 acres to A. Jernigan, the possession and use and cultivation of the land on the Wagnon was under and by permission of W. A. Jernigan, there is no basis for appel-

lant's contention that after such conveyance A. Jernigan's possession would not inure to the benefit of W. A. Jernigan.

[2] As to the land claimed by Cobb, as to which the same question is raised by the second assignment of error, there was sufficient testimony to show that A. Jernigan, while he was the owner of the entire 640 acres, opened up a field of considerable extent in the southwest corner of the Jernigan 160 acres, which extended over on the Wagnon on the west and on the south, over on the A. Jernigan 320 acres, and also over on that part of the 320 acres which lies south of the 40 acres cut off to make the 200 acres, being on that part of the land claimed by Cobb. The exact extent of that part of this field on the Cobb is not definitely shown, but, as the entire 640 acres was at that time under the ownership of A. Jernigan, there is no ground for the application of the doctrine that it was a mere encroachment, and not sufficient to give notice to the true owner of the hostile claim, as laid down in Titel v. Garland, 99 Tex. 201, 87 S. W. 1152, Bracken v. Jones, 63 Tex. 184, and other cases along the same line.

The evidence showed that this field was cultivated continuously by the Jernigan boys after the conveyance to Thornton & Stegner, under agreement with them, up to the time Cobb took possession by putting the whole tract under fence when he bought. This possession alone, extending from the date of the conveyance to Thornton & Stegner, November 13, 1897, up to the filing of the suit in 1908, was sufficient to mature the claim of appellee Cobb into a title under the 10-year statute.

We are of the opinion that neither of the assignments of error, presenting the question as to the sufficiency of the evidence to sustain the judgment as to the Cuffie and Cobb tracts, respectively, can be sustained. There is no other question presented by appellant in its brief.

[3] On the trial of the case, appellant introduced in evidence, as part of its chain of title, proceedings of the probate court of Nacogdoches county in the estate of Wm. G. Logan, by which the administrator was authorized, upon the petition of George May, to make to George May, or to any person he might direct, a conveyance of the Bicera league, the purpose of the conveyance being to carry out a contract between Logan and other parties and the conveyance of the administrator made thereunder. This was in 1839. The admission and consideration of this evidence is complained of by appellees by cross-assignments of error.

It must be conceded that this proceeding and the deed made thereunder were void. Houston v. Killough, 80 Tex. 296, 16 S. W. 56; McCarty v. Merry et al., 59 S. W. 304. The probate court was at that date without jurisdiction to decree specific performance of a contract for the sale of land.

[4] It appears that Henry Raguet was administrator of the estate of Wm. Logan, and in 1861 Mrs. Guin, formerly wife of Logan, and the owner of one-half of the land which was community, joined by her husband, and the other heirs of Logan (it being conceded that these parties were the only heirs of Logan), instituted a suit in the district court of Nacogdoches county, the exact nature of which is not shown as the papers were lost or destroyed, but which appears to have been a suit to adjust certain claims made by the heirs against Raguet as administrator, and also growing out of certain dealings between Raguet and Logan, whereby they held and owned certain lands jointly. The decree in this case, after providing for the partition of certain lands between plaintiffs and defendant, contains this provision: "All sales made by said Henry Raguet as administrator (of the estate of Logan) of any and all lands heretofore belonging to or claimed by said estate are hereby decreed to be valid, and, as to such lands or any part of them, the said parties relinquish all claim whatever, and said sales are fully confirmed." This decree was by agreement of all the parties and was made in 1861. The conveyance by Raguet of the Bicera league referred to was made in 1839. All of the heirs of Wm. G. Logan were parties to this agreed decree. We think it is perfectly clear that the purpose and effect of this part of the decree was to ratify and confirm the conveyance of the Bicera league under the void probate proceedings, and that it was so intended and understood by all of the parties. Though the decree was made in 1861, and there has been continuous assertion of title under the deed of 1839 and this decree, it is not shown that the heirs of Logan or any of them have ever at any time asserted any title to the land since said date, 50 years ago.

[5] It does not affect the binding force of the decree as showing title in appellant that the holders of the hostile title now set up by appellees were not parties to the decree. Its purpose was not to affect their title, but to show that appellant had the Logan title.

It further appears that Mrs. Logan, who had in the meantime married Guin, and who was the owner of one-half of the land after the death of Logan, by written instrument signed by her but not acknowledged, and executed July 15, 1840, relinquished all of her right, title, and interest in the Bicera league to George May.

[6] By their third proposition under the first cross-assignment of error, appellees complain also of the admission and consideration of this instrument on the ground that at the date mentioned married women were not authorized to make conveyance of their separate estate except by fine and recovery,

as under the common law. This objection is not embraced in the assignment of error, and will not be considered. It is, in the view we take of the agreed decree referred to, entirely immaterial whether or not any title passed by this deed of Mrs. Guin.

[7] But it seems to be established by the decisions of this state that before the passage of the act of February 3, 1841 (Laws 1840-41, p. 144), with regard to acknowledgments of deed by married women to their separate estate, privy acknowledgment was not necessary to the validity of such deeds. Groesbeck v. Bodman, 73 Tex. 292, 11 S. W. 322. The question seems to have been decided without reference to the act adopting the common law in 1840.

[8] It will be presumed in support of the title, after this great lapse of time and the absence of any claim to the contrary, that Mrs. Guin's conveyance was with the consent of her husband. The cross-assignment of error does not present this question, and its decision does not seem to us to be necessary, even if presented. It is immaterial, if we are correct in our conclusions, either on the question of limitation or on the effect of the decree of the district court in 1861, referred to. There is, we think, no merit in the cross-assignments of appellees.

We find no error in the record calling for a reversal of the judgment, and it is affirmed.

Affirmed.